| | | |
|---|---|---|
| JENNIFER GIERER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14-CV-1382 CAS |
| | ) | |
| REHAB MEDICAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant Rehab Medical, Inc.'s ("Rehab Medical") motion for summary judgment. Plaintiff Jennifer Gierer ("plaintiff") opposes the motion. The matter is fully briefed and ready for decision. For the following reasons, the Court will grant defendant's motion as to plaintiff's claim of retaliation under the False Claims Act (Count I). The Court will decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims for unpaid commissions due under Missouri Revised Statute § 407.913 (Count II), unjust enrichment (Count III), and wrongful termination in violation of public policy (Count IV), and will dismiss these claims without prejudice.

## I.      Background

Plaintiff, a former sales representative for Rehab Medical, filed this action against her former employer alleging retaliation for engaging in unlawful acts under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"). She brings her action in four counts: retaliation under the FCA (Count I); unpaid commissions due under Missouri Revised Statutes § 407.913 (Count II); unjust

enrichment (Count III); and wrongful termination in violation of public policy (Count IV).[1] Defendant Rehab Medical is a supplier of various electric-motorized wheelchairs. Plaintiff alleges she was subject to retaliation after expressing concern regarding Rehab Medical's alleged falsification of documents to the Medicare federal health insurance program.

## II.     **Summary Judgment Standard**

The Eighth Circuit has articulated the appropriate standard for consideration of motions for summary judgment as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal citations and quotation marks omitted).

With this standard in mind, the Court accepts the following facts as true for purposes of resolving the motion for summary judgment.

---

[1]The operative complaint is plaintiff's third amended complaint, filed October 24, 2016. See Doc. 103.

## III. Facts[2]

Rehab Medical is a provider of medical mobility equipment, including complex wheelchairs. A large percentage of equipment sold by Rehab Medical is authorized and paid for by Medicare. Rehab Medical's sales representatives help customers determine their equipment needs depending upon their level of physical mobility.

Once a sales representative receives all the necessary documentation for a customer, the documentation is sent to Rehab Medical's internal review team, which audits the documentation to ensure all documents have been submitted and that the documents are not deficient in any way. If the documentation is not complete, the file is sent back to the sales representative to cure any errors or deficiencies by obtaining the necessary information from the medical personnel involved in the mobility evaluation. After internal review of the file, the equipment is delivered to the customer and then billed through the applicable insurance. At times, the internal review

---

[2]Plaintiff responded to the majority of defendant's undisputed facts simply by "objecting." Often, plaintiff does not "specifically controvert" the facts as required by Local Rule 4.01(E), but instead states that the facts are not supported by defendant's citations. While it is true that defendant's citations are often wrong because of a clerical error in the numbering and filing of its exhibits, this error is obvious and easy to reconcile, but plaintiff chose to object nonetheless. In order to meet her affirmative burden to designate specific facts showing there is a genuine issue for trial, see Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003), Fed. R. Civ. P. 56(c), plaintiff must state the facts that contradict the facts of the moving party, and then provide citations to support the specific facts asserted by the plaintiff. It is not sufficient merely to state that a fact is objected to. See Ragas v. Tenn. Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir.1998) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (internal citation omitted).

The Court notes that counsel have been unusually disrespectful toward each other throughout this case, and their filings often require the Court to muddle through petty gripes and bickering to find the substance of the issues. This type of conduct is unprofessional and does a disservice to both the parties and the Court. The Court strongly urges counsel to endeavor to demonstrate professionalism and to maintain civility and decorum in their future litigation.

team will deny a claim for lack of information or documentation errors. The file is then sent back to the sales representative to cure the additional deficiencies, if possible.

Rehab Medical hired plaintiff as a sales representative on October 14, 2013. She was terminated July 7, 2014. She worked in the St. Louis office. During her employment, plaintiff directly reported to Jenna Domeck, the Regional Manager responsible for training and managing the sales staff at Rehab Medical's offices in Kentucky, Missouri, Indiana, and Ohio. Ms. Domeck was supervised by Keith Hawkins, Director of Sales.

A.     <u>Plaintiff's Job Performance</u>

As a condition of her employment, plaintiff was required to meet a monthly sales quota. Plaintiff, like all other sales representatives, started with a low quota at hire, and the quota gradually increased. The gradual increase was designed to allow sales representatives a period of time to acclimate to the sales process and their new job. Under the quota system, each piece of equipment has a point value; the more expensive and complex products have a higher point value than less expensive products. For example, a complex chair has a higher point value than a chair cushion. Each sales representative is provided a numerical monthly quota. A sales representative earns her quota points when the equipment is delivered to the customer; a sales representative earns her commission, however, when Rehab Medical receives payment for the equipment.

In November 2013, plaintiff's second month of employment, her quota was one point. Plaintiff earned 2.78 points. According to defendant, only .53 of the points were earned by plaintiff. The remainder of the points was transferred to plaintiff to finalize work done by a departed employee and Ms. Domeck. <u>See</u> Hawkins Aff. ¶ 42; Def. Ex. 13.

In December 2013, plaintiff's quota was two points. Plaintiff earned 1.93 points. She was ranked 43 of 45 sales representatives employed by Rehab Medical that month based on sales and quota points.[3] See Def. SOF ¶ 60; Def. Ex. 13; Hawkins Aff. ¶ 42.

In January 2014, plaintiff's quota was 4 points, and she earned 0.5 points. Plaintiff was ranked 43 of 46 sales representatives employed by Rehab Medical that month. See Def. SOF ¶ 62, Ex. 13.

In February 2014, plaintiff's quota was 6 points, and she earned 2.4 points. She was ranked 37 of 43 sales representatives employed by Rehab Medical that month. See Def. SOF ¶ 63; Ex. 13.[4]

In March 2014, plaintiff's quota was increased to the standard rate of 8 points, and she earned 1.25 point. She was ranked 43 of 43 sales representatives employed by Rehab Medical that month. See Def. SOF ¶ 64; Def. Ex. 13; Hawkins Aff. ¶ 44.

On April 2, 2014, Keith Hawkins, the Director of Sales, sent plaintiff an e-mail, stating "You've sold 8 products total this year . . . It's time to step up. As easy as some other products are to get approved, I expect April to be a much better month. We all need you to utilize all products that we have available and improve tremendously." Def. Ex. 14. Plaintiff responded, "No problem and I'm equally if not more frustrated that my [quota points] have not been getting what they need faster!" Id.

_____

[3]Plaintiff denies the accuracy of these figures, and states that defendant's Exhibit 13 refutes them. Defendant's Exhibit 13 confirms these figures, however. In her second month of employment (November) plaintiff's quota was 1 point, and she earned 2.78; in her third month of employment (December) her quota was 2 points and she earned 1.93; in her fourth month of employment (January) her quota was 4 points, and she earned .5. See Def. SOF, Ex. 13.

[4]Plaintiff denies the accuracy of these figures, and states that according to her exhibit C she earned 3.1 quota points in February 2014. Exhibit C is undated, and does not support plaintiff's statement. Although Exhibit C shows plaintiff as earning 3.10 quota points, this likely represents her quota points for May 2014. Compare Pl. Ex. C with Def. Ex. 13.

In April 2014, plaintiff's quota was 8 points, and she earned 7.6 points. This was plaintiff's best sales performance month during her employment. She was ranked 20 out of 44 sales representatives at Rehab Medical. See Def. SOF ¶ 65; Def. Ex. 13; Hawkins Aff. ¶ 45.

In May 2014, plaintiff's quota was 8 points, and she earned 3.1 points. She was ranked 45 out of 48 sales representatives at Rehab Medical that month. See Def. SOF ¶ 66; Def. Ex. 13; Hawkins Aff. ¶ 45.

As a result of plaintiff's failure to meet her quota for six of the seven months she had been employed by Rehab Medical, especially considering how far below the quota she fell many of the months of her employment, Keith Hawkins stated that he believed she should be terminated. See Hawkins Aff. ¶ 51. Instead, though, on June 5, 2014, he placed plaintiff on a performance improvement plan ("PIP"). Plaintiff was notified and acknowledged receipt and obligation to comply with the PIP. The PIP provided that plaintiff was required to meet at least 70 percent of her total monthly quota for the months of June, July, and August 2014. Id.; see also Def. Ex. 15. The PIP stated, in relevant part:

> Jen, it has been determined that your performance is below the company standard and expectation. Your performance needs to improve over the next 90 days with respect to your sales. Specifically for the months of June, July and August 2014, you must achieve 70% to quota. You must have a minimum of 16.5 points by the end of August. However, *if in any single month your points are below 4, the company reserves the right to terminate your employment at the conclusion of that month.*
>
> The company wants to support your success. It will be incumbent upon you to communicate any obstacle(s) preventing you from achieving the sales goals stated above. The company encourages you to maintain an open dialogue with your Regional Manager [Jenna Domeck] and Director of Sales [Keith Hawkins].
>
> Failure to obtain the sales goals stated herein could result in further disciplinary action up to and including termination of employment.

Def. Ex. 15 (emphasis added).

In June 2014, plaintiff earned 3 points. She was ranked 40 out of 43 sales representatives employed by Rehab Medical that month. Mr. Hawkins testified that based on plaintiff's well-established history of poor sales performance and her inability to meet the PIP's reduced quota of four points, he made the decision to terminate her effective July 7, 2014. (Hawkins Aff. ¶ 53.) Plaintiff, however, states that she did not meet her quota in June 2014 because Rehab Medical ran out of inventory, and she could not timely deliver the items she sold. (Pl. Dep. at 180.) She also alleges her termination was in retaliation for engaging in activity protected under the FCA.

B.     Plaintiff's Protected Conduct

Plaintiff alleges many instances in which she engaged in protected conduct under the FCA. The Court will discuss the alleged protected conduct, in roughly chronological order.

*(1)     Refusing to Insert ICD-9 Codes*

Plaintiff testified that at some point during her first month of employment with Rehab Medical in October 2013, Ms. Domeck directed her to fill in certain medical codes, ICD-9 codes, on mobility evaluation related forms. (Pl. Dep. 312-13.) Plaintiff refused because she believed only medical professionals were allowed to fill in these codes along with the medical information. Plaintiff did not fill in the ICD-9 codes during her employment. She testified:

Q.     So the ICD-9 codes that [Ms. Domeck] told you just to go ahead and fill in what the doctor tells you, you didn't call anyone in the company to complain about that conduct?

A.     No, I just didn't do it, and nobody ever said a word.

(Pl. Dep. at 312.)

Ms. Domeck testified regarding plaintiff and the ICD-9 codes as follows:

Q.     Okay. And do you know whether or not CMS guidelines and Medicare guidelines permit a sales associate to fill out ICD-9 codes?

. . .

A.      I – I don't know.  I just know this was company policy that we were to fill this out.

. . .

Q.      Okay.  Did anyone ever express an objection to you about filling out ICD-9 codes?

. . .

A.      I remember Jenn bringing up – asking if we were to fill those out.  And I think I looked into it and told her that she didn't have to if she didn't want to.

Q.      Okay.  So at some point Ms. Gierer did bring to your attention that there was a compliance violation in that the company was asking all sales associates to fill out ICD-9 codes?  You were made aware of that?

A.      She did let me know she didn't feel comfortable doing that.

(Domeck Dep. at 158-59.)

### (2)    *Refusing to Draft Attestation Letters*

Plaintiff testified that in November or December 2013, a male employee named Shannon offered to show plaintiff how to write an attestation letter.  Shannon told plaintiff he could send her an example of an attestation letter, but needed to send it to plaintiff's personal e-mail account.  Plaintiff refused, because she believed it was the doctor's responsibility to draft attestation letters.  (Pl. Dep. at 312.)  When asked whether she reported this activity to anyone in the company, plaintiff stated that she did not.  (Id. at 313.)

### (3)    *Refusing to Draft Templates*

In December 2013, plaintiff testified that Ms. Domeck instructed plaintiff to prepare an electronic medical record template for a doctor.  The template would simplify the doctor's work in recording his patient's mobility, for example, the doctor could just check a box as opposed to writing out a diagnosis.  Plaintiff testified that Ms. Domeck provided her with a template to use

with a particular doctor, Dr. James Williams. Plaintiff told Ms. Domeck that "you can't do that. It's illegal. You can't do that stuff. That's not right. We're going to get – you'll get in trouble and I refuse to do that." (Pl. Dep. at 315.) Plaintiff never used a template, and never reported Ms. Domeck's template use to anyone at Rehab Medical.

In January 2014, at a national sales meeting, plaintiff recalls Ms. Domeck stating in front of a large group of sales representatives that she writes her own templates for doctors to sign. Plaintiff testified that Ms. Domeck said this in front of all the sales representatives from the Louisville office, plaintiff, and one other woman. (Pl. Dep. at 269-70.)

Plaintiff also stated that another employee, Brian Bennett, was working in the St. Louis office temporarily, and one evening he was on a conference call with plaintiff and Ms. Domeck. Mr. Bennett stated that he would take care of writing a template for all of the Rehab Medical centers because he already had one put together. Plaintiff stated she did not inform anybody of that discussion, but after the call, Ms. Domeck agreed with her that "that [was] a little much." (Pl. Dep. at 320.)

### (4)     *Refusing to Coach a Nurse*

Plaintiff testified that Ms. Domeck told her she could coach a nurse on what to write on a particular chart note. (Pl. Dep. at 315-16.) When asked whether she reported this allegedly unlawful activity, plaintiff testified, "I did not tell anyone up the chain of command because I told her because of the dynamic of the situation it was very bizarre. Like her and Keith [Hawkins, Director of Sales,] had this relationship where I knew I couldn't go to him because I tried to go to him once to ask him a question, and he was like, 'Always go to Jenna. I don't have time for this kind of stuff.'" (Pl. Dep. at 316.)

*(5)      Reporting to Jared Rankin[5] that Ms. Domeck Wrote ATP Reports*

Plaintiff testified that in January or February 2014, at an in-service training, she approached Jared Rankin, the office manager for the Indianapolis office,[6] and told him that Ms. Domeck had been writing ATP reports but was not RESNA certified.  Plaintiff told Mr. Rankin that she believed Ms. Domeck was engaging in unlawful activity.  (Pl. Dep. at 319.)

Mr. Rankin testified that he attended a sales conference in Kentucky, and believed plaintiff was in attendance, but he did not recall having any conversation with her.  (Rankin Dep. at 18.)  He also recalled travelling to St. Louis in April 2014, but did not recall having any conversations with plaintiff.  (Id. at 16.)  Mr. Rankin testified that if he knew of any false claims or fraudulent behavior at Rehab Medical, whether he witnessed it or somebody brought it to his attention, he would have reported it.  (Id. at 38-39.)  Mr. Rankin testified he had no knowledge that plaintiff had been terminated in July 2014 until afterward, and no knowledge of the reason for her termination.  He did not recall any conversation with plaintiff, and stated "I do know that she did not report any wrongdoing to me.  . . .  If that were reported to me, then I would have taken action at that point."  (Id. at 41-44.)

*(6)      Receiving Altered Documents from the Medicare Review Team*

During the third week of May 2014, an employee from Rehab Medical's Medicare review team located in Indianapolis, Megan Curran, called plaintiff in confidence and explained that she had been forced to use White-Out on documents before submitting the documents to Medicare.  (Pl. Dep. 274-75; 255.)  Plaintiff testified, "I had one of the Medicare review people,

---

[5]The parties misspell Mr. Rankin's last name throughout the filings, but it appears the appropriate spelling is "Rankin."

[6]Mr. Rankin testified that he was the office manager at Rehab Medical's Indianapolis, Indiana office.  Ms. Domeck testified, however, that Mr. Rankin was the "director of the Rehab team of complex chairs."  (Domeck Dep. at 308.)

Megan, call me and crying one day because she was just in shock that she had been told by her boss, Derrick Bass, that if she didn't start whiting out fax headers, changing dates on PDF, 7 Elements, and all that, and they literally were making them change dates, back-date things to make it compliant for Medicare, and [she] said I was the only one she could trust."  (Pl. Dep. 249-50; 372.)

Plaintiff testified that she did not tell anybody at Rehab Medical about this call from Ms. Curran.  Shortly thereafter, from approximately June 5 through June 13, 2014, Ms. Curran began sending the original versions of these documents and the altered versions of these documents to plaintiff at plaintiff's home address.  (Pl. Dep. 255, 257.)  Plaintiff did not report any of this information to Rehab Medical; plaintiff gave these documents to her attorney, whom she had retained in approximately May 2014.  (Id. at 259.)

(7) <em>Refusing to Alter Dates of a Face-to-Face Meeting</em>

On June 5, 2014, plaintiff and Ms. Domeck received an e-mail from Stephanie Adair, an employee with Rehab Medical's Medicare review team, asking plaintiff to alter a date of a face-to-face appointment between a patient and doctor.  The e-mail subject line read, "Need Paperwork Corrections – Need Paperwork Corrections."  The email stated "Due to the [face-to-face] date being from February[,] I think we will run into the 120 day delivery  policy.  Please have the [face-to-face] date changed to the date the Rx was signed."

Plaintiff said she immediately called Ms. Adair and told her, "You know that that's fraud; right?  I can't do that.  So the only option is to get another face-to-face."  Ms. Adair responded, "No, no, no.  Just have [the doctor] back-date the Rx."  Plaintiff stated that was the end of the discussion.  Plaintiff said she did not report this to anybody else in the company, but decided to contact an attorney.  (Pl. Dep. at 321.)

## IV.    Discussion

### A.    Retaliation Under the FCA (Count I)

Defendant moves for summary judgment on plaintiff's retaliation claim under the FCA's whistle-blower protection provision (Count I).  The FCA provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).

To prove retaliation under this section, plaintiff must prove that (1) she was engaged in conduct protected by the FCA; (2) her employer knew that she engaged in the protected activity; (3) her employer retaliated against her; and (4) the retaliation was motivated solely by the plaintiff's protected activity.  See United States ex rel. Miller v. Weston Educ., Inc., 840 F.3d 494, 505 (8th Cir. 2016) (quoting Schuhardt v. Washington Univ., 390 F.3d 563, 566 (8th Cir. 2004)).

#### (1)    Engaged in Protected Activity

Plaintiff must first show she engaged in protected activity.  Id.  Protected activity is established if plaintiff can show:  (1) her conduct was in furtherance of an FCA action, and (2) her conduct was aimed at matters that were calculated, or reasonably could lead, to a viable FCA action.  Schuhardt, 390 F.3d at 567.  To find protected activity, the Court must find that plaintiff's conduct was in furtherance of an FCA action.  Id. (citing United States ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996)).  "Specific awareness of the FCA is not required.  However, the plaintiff must be investigating matters which are calculated, or reasonably could

lead, to a viable FCA action." Hopper, 91 F.3d at 1269. "[A]n employee's activities that are not related to exposing or deterring fraud, are not 'whistle blowing as envisioned in the paradigm *qui tam* FCA action.'" Schuhardt v. Washington Univ., 361 F.Supp.2d 992, 1017 (E.D. Mo. 2003) (quoting Hopper, 91 F.3d at 1269), rev'd on other grounds by Schuhardt, 390 F.3d 563.

As to the second condition, "An employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." Schuhardt, 390 F.3d at 567 (quoting Wilkins v. St. Louis. Hous. Auth., 314 F.3d 927, 933 (8th Cir. 2002)). This condition does not require plaintiff to have filed an FCA suit or to "have developed a winning claim at the time of the alleged retaliation." Id.

Viewing the evidence in the light most favorable to plaintiff, and drawing all inferences in her favor, the Court does not find the following activity was in furtherance of an FCA action: (1) refusing to insert ICD-9 codes, (2) refusing to draft attestation letters, (3) refusing to draft templates for doctors' use, and (4) refusing to coach medical professionals as to the language to use in medical records. The Court will assume for purposes of this motion, however, that the following activity was in furtherance of an FCA action: (1) reporting to Mr. Rankin that Ms. Domeck wrote ATP reports, (2) refusing to alter the face-to-face date in a patient's medical file, and (3) receiving information from Ms. Curran regarding unlawful activity. The Court will discuss each in turn.

At the time plaintiff refused to fill out the ICD-9 codes, prepare templates, and draft attestation letters, she was a relatively new employee. She had been hired in October 2013, and these directives were given in October, November, or December 2013. At this point, there is no evidence that plaintiff was investigating or trying to deter any fraud. Plaintiff testified that as a

sales representative, she was uncomfortable filling in ICD-9 codes, which she thought should be filled in my medical personnel. She told her supervisor. Her supervisor responded that plaintiff did not have to fill in the codes. There is no evidence from which the Court could find plaintiff refused to fill in ICD-9 codes in furtherance of a FCA action. Rather, the evidence shows plaintiff did not believe she should be filling in the codes, and told her supervisor as much. Her supervisor, Ms. Domeck, looked into it and responded to plaintiff that she did not have to fill out these codes. All of this activity occurred within one month of plaintiff's hiring, and the Court does not find this was in furtherance of any FCA claim.

Likewise, plaintiff did not use templates as suggested by Ms. Domeck and did not draft attestation letters for doctors as suggested by Ms. Domeck and a fellow sales representative, Shannon. These issues arose in November and December 2013, and there is no evidence from which the Court could draw an inference that plaintiff was investigating matters calculated, or that reasonably could lead, to a viable FCA action. Rather, the record shows that plaintiff was a relatively new hire, and was being trained to do things that she felt were outside her authority as a sales representative. She either told her supervisor she was uncomfortable performing those tasks, e.g., the ICD-9 codes and using templates, or she simply did not do them, e.g., draft attestation letters. Viewing the evidence in the light most favorable to plaintiff, the Court finds plaintiff's conduct of refusing to draft templates and draft attestation letters was not in furtherance of an FCA action. Plaintiff was not investigating matters calculated, or that reasonably could lead to, a viable FCA action.

Also, plaintiff testified that Ms. Domeck suggested that plaintiff could coach a physician and nurse as to what to write in the medical file. Plaintiff believed this to be unlawful, and did not coach medical staff. Plaintiff did not, however, report this to any one at Rehab Medical. (Pl.

Dep. at 315-16.)  Viewed in the light most favorable to plaintiff, the Court finds plaintiff was not acting in furtherance of an action under the FCA when she listened as Ms. Domeck suggested she coach medical professionals on what to write in patients' files.

The Court finds it a closer question as to whether plaintiff's following activities were in furtherance of an FCA action:  In January or February 2014, she reported to Mr. Rankin that Ms. Domeck was drafting ATP reports without being certified, and on June 5, 2014, plaintiff refused to alter the face-to-face meeting date at the directive of Ms. Adair, an employee on the Medicare review team.  For purposes of summary judgment, the Court will assume plaintiff was engaged in conduct protected by the FCA when she reported Ms. Domeck to Mr. Rankin and when she refused to alter a date in the medical record.  In each instance, plaintiff notified her superior that these actions were fraudulent or unlawful.

With respect to Ms. Curran calling plaintiff and reporting unlawful activity and later mailing plaintiff unlawfully altered files, these activities show Ms. Curran was engaged in conduct protected by the FCA.  But these activities do not necessarily point to plaintiff being engaged in conduct protected by the FCA.  Based on plaintiff's testimony, it appears she passively received this information and forwarded the files to her attorney.  Because this could be construed as part of an investigation, however, the Court will assume plaintiff was engaged in protected conduct when she received Ms. Curran's unlawfully altered medical records.

In sum, the Court will assume for purposes of this motion that plaintiff engaged in conduct protected by the FCA when she reported Ms. Domeck to Mr. Rankin, when she refused to alter the date of the face-to-face meeting as instructed by Ms. Adair, and when she received information from Ms. Curran regarding Rehab Medical's unlawful activity.

To prove the notice element of a § 3730(h) claim, an employee is "required to present evidence from which a jury could reasonably find that defendant was on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." Schuhardt, 361 F.Supp.2d at 1016. "Unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." Hopper, 91 F.3d at 1269.

Rehab Medical was aware through Mr. Rankin that plaintiff had complained of Ms. Domeck's unlawful preparation of ATP reports. Rehab Medical was also aware that plaintiff refused to change the face-to-face date in a patient's medical file at the direction of Ms. Adair. Plaintiff told both Mr. Rankin and Ms. Adair that the activity Rehab Medical was engaged in was fraudulent or against the law. For purposes of summary judgment, the Court finds that such conduct was protected by the FCA and that Rehab Medical had knowledge of it.

As to the altered files forwarded from Ms. Curran, however, plaintiff testified she did not inform Rehab Medical of Ms. Curran's mailing of altered documents to plaintiff's home address. Nor did she report the telephone call from Ms. Curran in which Ms. Curran disclosed the alteration and fabrication of records. Thus, Ms. Curran's activity, and plaintiff's response, cannot form the basis of plaintiff's claims that she was retaliation against because of lawful acts under the FCA. Rehab Medical had no knowledge plaintiff was engaged in this conduct.

*(3)    Employer Retaliated*

As to the retaliatory actions, plaintiff claims Rehab Medical placed her on a performance improvement plan and later fired her in retaliation for her FCA protected activity. Plaintiff was placed on the performance improvement plan on June 5, 2014, and was terminated July 7, 2014.

The Court finds these actions adverse to plaintiff's employment, and their timing could support an inference of retaliation.

*(4)     Retaliation Motivated Solely By Protected Activity*

The final element of a retaliation case under the FCA is that "the retaliation was motivated *solely* by the plaintiff's protected activity." <u>Elkharwily v. Mayo Holding Co.</u>, 823 F.3d 462, 470 (8th Cir. 2016) (emphasis added). Plaintiff has failed to establish that the initiation of the performance improvement plan and her termination were motivated solely by her reports of FCA violations.

The record is replete with evidence of plaintiff's poor sales performance. From November 2013 through June 2014, she never met her sales quota. (Def. SOF, Ex. 13.) Plaintiff was consistently ranked at the bottom of all sales representatives company-wide based on sales performance. For example, in December 2013, she was ranked 43 of 45 sales representatives; in January 2014, she was ranked 43 of 46; in February 2014, she was ranked 37 of 43; in March 2014, she was ranked last, 43 of 43. After her poor performance in March, the Director of Sales Keith Hawkins sent plaintiff an e-mail. The e-mail dated April 2, 2014, states "You've sold 8 products total this year . . . It's time to step up. . . . I expect April to be much better. We all need you to utilize all products that we have available and improve tremendously." (Def. SOF, Ex. 14.)

In April 2014, plaintiff performed at her best, but still fell short of the 8 quota points, earning 7.6 quota points. Plaintiff was ranked 20 out of 44 sales representatives for April 2014. In May 2014, she dropped considerably, earning only 3.l of her 8 quota points and ranking 45 out of 48 sales representatives.

On June 5, 2014, Mr. Hawkins put plaintiff on a performance improvement plan. He stated that her performance was below company standards and expectation. The performance improvement plan required her to achieve 70 percent of quota for June, July, and August 2014. It specified that "if in any single month your points are below 4, the company reserves the right to terminate your employment at the conclusion of that month." (Def. SOF, Ex. 15.)

For the month of June, plaintiff earned 3 quota points and was ranked 40 out of 43 sales representatives. Mr. Hawkins testified, "Given plaintiff's well-established history of poor sales performance and her inability to meet a greatly reduced quota number I made the decision to terminate plaintiff's employment effective July 7, 2017." (Hawkins Aff. ¶ 53.) Mr. Hawkins further testified by affidavit that he had no knowledge plaintiff had any concerns regarding Rehab Medical's practices, and no knowledge of plaintiff raising any concerns during her employment regarding improper of fraudulent behavior. (Id. at ¶ 54.)

Plaintiff blames her failure to meet quota in June 2014 on a lack of inventory, however, she has submitted no evidence that any sales were pending but undelivered because of a lack of inventory in June. (Pl. Dep. at 323-24.) Regardless, she had failed to meet her quota for the six months prior to June 2014, and had already been given a written warning in April 2014.

Rehab Medical has a well-documented history of plaintiff's poor performance. Except for her first month of employment, she never met her sales quota. In April 2014, prior to much of the alleged protected activity, Mr. Hawkins had alerted plaintiff to her unsatisfactory sales performance and her need to increase sales. Viewing all the evidence in the light most favorable to plaintiff, and giving her the benefit of all inferences, including assuming she has met the first three prongs of her FCA retaliation case, the Court finds plaintiff cannot show that any

retaliation against her by Rehab Medical was motivated solely by plaintiff's protected activity. Plaintiff simply had not performed at or near expectations.

For this reason, the Court will grant defendant summary judgment on plaintiff's claim for retaliation under the False Claims Act (Count I).

B.     <u>Diversity Jurisdiction Does Not Exist, and Court Declines to Exercise Supplemental Jurisdiction over the Remaining State Law Claims</u>

"Courts have an independent obligation to determine whether subject-matter jurisdiction exists[.]" <u>Hertz Corp. v. Friend</u>, 559 U.S. 77, 94 (2010). The third amended complaint's jurisdictional allegations rely solely on federal question jurisdiction pursuant to the provisions of the FCA. (3d Am. Compl. ¶ 6.) The Court has dismissed the FCA retaliation claim in Count I, leaving only claims arising under Missouri state law: unpaid commissions under Missouri Revised Statute § 407.913 (Count II); unjust enrichment (Count III); and common law wrongful termination in violation of public policy (Count IV). Although plaintiff has filed multiple amended complaints, the third amended complaint fails to allege jurisdictional facts sufficient to establish diversity jurisdiction.

The diversity statute, 28 U.S.C. § 1332(a)(1), requires complete diversity of citizenship between plaintiffs and defendants. <u>Buckley v. Control Data Corp.</u>, 923 F.2d 96, 97, n.6 (8th Cir. 1991). "Complete diversity of citizenship exists where no defendant holds citizenship in the same state where any plaintiff holds citizenship." <u>OnePoint Solutions, LLC v. Borchert</u>, 486 F.3d 342, 346 (8th Cir. 2007). As the party asserting federal jurisdiction, plaintiff bears the burden to establish complete diversity of citizenship. <u>See Branson Label, Inc. v. City of Branson, Mo.</u>, 793 F.3d 910, 917 (8th Cir. 2015). Plaintiff has not met this burden, as her citizenship allegations are deficient. Plaintiff does not plead facts to establish the citizenship of Rehab Medical because she does not plead the state in which its principal place of business is

located.  See 28 U.S.C. § 1332(c)(1) (corporation is a citizen of every state by which it has been incorporated and the state where it has its principal place of business).  Compare 3d Am. Compl. ¶ 14 (addressing only defendant's corporate headquarters) with id. at ¶ 38 (stating defendant operates offices in Florida, Georgia, Indiana, Kentucky, Missouri, Nevada, Ohio, and Utah, and is known to transact business in Illinois and Kansas).  Plaintiff also does not plead her citizenship, stating only that she is a resident of St. Louis, Missouri.  Id. at ¶ 12.  "When it comes to diversity jurisdiction, the words 'resident' and 'citizen' are not interchangeable.  See, e.g., Dubach v. Weitzel, 135 F.3d 590, 593 (8th Cir. 1998)."  Reece v. Bank of New York Mellon, 760 F.3d 771, 777 (8th Cir. 2014).

Even if the Court were to assume the existence of complete diversity of citizenship, which it cannot, plaintiff provides no specific information regarding the amount of her damages. The federal diversity jurisdiction statute provides the amount in controversy must exceed the sum of $75,000, exclusive of interest and costs.  28 U.S.C. § 1332(a).  The amount in controversy is to be ascertained from the complaint itself.  Horton v. Liberty Mutual Ins. Co., 367 U.S. 348, 353 (1961).  Specific facts or evidence are required to demonstrate that the jurisdictional amount is met.  See Hill v. Ford Motor Co., 324 F. Supp. 2d 1028, 1036 (E.D. Mo. 2004).  In the third amended complaint, plaintiff states only that she was paid $18.75 per hour and received a commission of eight percent.  She seeks actual damages, interest, punitive damages, and attorneys' fees, but provides no facts tending to quantify them.  Because complete diversity of citizenship and the requisite amount in controversy do not appear from the face of the third amended complaint, there is no diversity jurisdiction.

The Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  It is within the Court's discretionary authority, however, to decline to exercise

supplemental jurisdiction over state law claims once it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); see Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009); Simes v. Arkansas Jud. Discipline and Disability Comm'n, 734 F.3d 830, 835 (8th Cir. 2013). The Eighth Circuit has stated that "federal courts should exercise judicial restraint and avoid state law issues wherever possible." Thomas v. Dickel, 213 F.3d 1023, 1026 (8th Cir. 2000) (internal quotation marks and quoted cases omitted). As a result, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Barstad v. Murray County, 420 F.3d 880, 888 (8th Cir. 2005) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

Here, the Court has granted summary judgment in favor of defendant on the federal claim over which the Court had original jurisdiction, Count I. The only remaining claims are under state law, and none of the relevant factors point toward the exercise of supplemental jurisdiction in this case. The Court in the exercise of its discretion will decline to exercise supplemental jurisdiction over these claims and will dismiss them without prejudice to refiling in state court.

## V.     Conclusion

For the foregoing reasons, the Court will grant defendant Rehab Medical Inc.'s motion for summary judgment on Count I. The Court concludes that it does not have diversity jurisdiction over Counts II, III, and IV. Having done so, the Court in the exercise of its discretion declines to exercise supplemental jurisdiction over plaintiff's state law claims in Counts II, III, and IV, and will dismiss these claims without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that defendant Rehab Medical, Inc.'s motion for summary judgment is **GRANTED in part** and **DENIED in part as moot**.  [Doc. 118]  The motion is **GRANTED** as to plaintiff's claim for retaliation under the False Claims Act (Count I), and **DENIED as moot** in all other respects.  [Doc. 118]

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over plaintiff's remaining state law claims for unpaid commissions under Missouri Revised Statute § 407.913 (Count II), unjust enrichment (Count III), and wrongful termination in violation of public policy (Count IV), and these claims are **DISMISSED without prejudice**.

**IT IS FURTHER ORDERED** that all other pending motions are **DENIED as moot**. [Docs. 108, 133]

A Judgment and Order of Dismissal will accompany this Memorandum and Order.


_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this  14th  day of March, 2017.